## PHILADELPHIA & R. R. CO. v. PEEBLES.

(Circuit Court of Appeals, Third Circuit. May 3, 1895.)

### No. 1.

CONTRIBUTORY NEGLIGENCE.

In an action against a railway company for causing the death of one P., who was run over at a grade crossing, it appeared by plaintiff's witnesses that P. resided in the neighborhood of the crossing, and was familiar with it, and with the trains running over the road; that, from the road on which P. was traveling, at any point for several hundred feet from the crossing, the track on which the train which caused the accident approached could be seen, except for about 40 feet, where it was alleged the view was obstructed by a tool house; that P. approached the crossing in broad daylight, on a calm day, at the time when a well-known train was due, which ran at unusually high speed; and there was nothing to show that P. listened, looked, or took any precautions whatever. *Held*, that P. was guilty of contributory negligence, and the jury should have been instructed to give a verdict for defendant.

In Error to the Circuit Court of the United States for the District of New Jersey.

This was an action by Mary A. Peebles, as executrix of John Peebles, deceased, against the Philadelphia & Reading Railroad Company, to recover damages for the death of said John Peebles. Plaintiff recovered judgment in the circuit court. Defendant brings error. Reversed.

James J. Bergen, for plaintiff in error.

James L. Griggs, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge. On April 26, 1892, John Peebles was killed by the Royal Blue Line express train of the Philadelphia & Reading Railroad, while crossing the track at a point near Weston, N. J. His administratrix brought suit for damages, and recovered a verdict in the circuit court of the United States for the district of New Jersey. To the judgment entered thereon, the defendant company has sued out a writ of error to this court.

The facts of the case are as follows: The track runs in a straight line for several miles, and passes through a cut about 1,100 feet east of the crossing where the accident occurred. From the cut to the crossing it has an elevation of a couple of feet above the surrounding country. The road upon which the decedent was traveling runs parallel with the railroad for several hundred feet west of the crossing, and distant about 200 feet therefrom. Nearly opposite the crossing, and when about 165 feet distant, it turns an oblique angle, and crosses the track upon a slight rise. On the same side of the track, and

about 500 feet east of the crossing, was a tool house, 9 feet 6 inches high, 12 feet 6 inches wide, and 9 feet 7 inches long. Until within about 60 or 65 feet of the track, there was an unobstructed view of the track eastwardly for about 1,500 feet. For the next 40 feet it was claimed the tool house obstructed the view. For the next 20 feet, and until the track was reached, there was an unobstructed view of the track for 1,500 feet. The decedent was a farmer living about a mile from the crossing; was familiar with and had traveled the road often. On the afternoon in question, he came along it alone, in a one-horse buggy. The day was clear, and noise was carried a long distance. He was about 65 years of age; was slightly deaf. His horse was stubborn, hard in the mouth, and hard to back, and his buggy curtains were down. He approached the crossing about the regular passing time of the Royal Blue Line train, which was one of the regular trains, well known, and which ran at the highest speed, reaching as high as 60 miles an hour. The plaintiff's proofs do not show whether he stopped or took any precaution whatever. His horse cleared the track, the buggy was struck, and the decedent instantly killed. In the declaration, the only negligence alleged was the careless and negligent driving of the train at great speed over the crossing, without whistling or ringing a bell, the statute of New Jersey on that subject providing:

"Every incorporated company that has been or hereafter may be authorized to construct any railroad in this state, shall cause to be placed on some part of every locomotive engine used by such company a bell, of a weight of not less than 30 pounds, or a steam-whistle which can be heard distinctly at a distance of at least 300 yards, and shall cause such bell to be rung, or such steam-whistle to be blown, at a distance of at least 300 yards from the place where such railroad crosses such highways."

There was a whistle post for the crossing just west of the cut, 1,000 feet from the crossing.

At the close of the case, the defendant asked for binding instructions in its favor. This request was refused, and the case submitted to the jury in a charge to which error has been assigned. While the view we take of the case upon the question of the defendant's right to binding instructions is such as to render needless a discussion of the alleged subsequent errors of the court in the charge, yet we may say, referring to the eleventh assignment of error, that had the case been one proper to submit to the jury, the court erred, in our opinion, in assuming that the tool house was an obstruction to one traveling the road, and in so charging the jury.

Returning, however, to the prior question, did the court err in refusing the request for binding instructions? If the evidence was of such a conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict in plaintiff's favor, then this instruction should have been given. Railroad Co. v. Converse, 139 U. S. 472, 11 Sup. Ct. 569, and cases cited. Tested by this rule, we think the duty of the court to affirm this point was plain. The proofs adduced by the plaintiffs showed him guilty of contributory negligence, for, from the facts that are affirmatively shown on the plaintiff's side, we think but one con-

clusion can be reached.    This testimony showed the plaintiff was
familiar with the crossing, and had been going over it for years.    The
train was a regular schedule one, one of the best known on the road,
ran at an exceedingly high rate of speed, and was on time.    The
decedent was slightly deaf.    His horse was hard in the mouth, some-
what stubborn, and hard to back.    The side curtains of his buggy
were down.    The road was fenced in and led by an ascent beginning
30 feet away to the track.    A ditch at the one side prevented him
from turning when near the track.    Sixty feet from the track to
within twenty feet of it, his view was alleged to be obstructed by
the tool house, 500 feet above.    At 20 feet he had a view to the cut.

Plaintiff's witness Merrell says:

"Q. And, before you drive on the track, you could look down the road a
long distance, after you pass the point where you claim this tool house
interferes? A. Certainly; you can stop there and look."

A duty rested on the decedent, under the circumstances, of taking
the ordinary precautions to insure his own safety.    Lack of care by
the defendant's servants, if such there was, did not relieve the de-
cedent from care on his part.    He was bound to use his senses before
attempting to cross the track.    The very presence of a railroad con-
veyed to him, as a prudent man, notice of danger.    If he neglected to
use his senses, and thoughtlessly or rashly attempted to cross without
doing so, the result, if disastrous, cannot be visited on the railroad,
though it may not be free from blame in other respects.    These prop-
ositions are abundantly sustained by authorities, and accord with the
common judgment and experience of men.    The observance of these
precautions on the part of Mr. Peebles would, without question, have
saved his life.    If he had paid attention and been on the alert for the
train during the 40 feet it is said his vision was obstructed, he must
have heard its approach.    He was less than a quarter of a mile from
the cut, and the tool house, 500 feet away, would not interfere with
the travel of the sound.    The day was clear.    No wind was blowing,
and all the plaintiff's witnesses heard the train.    Thompson, a farm
hand, was working on the Van Ness farm south of the cut.    He heard
the noise made by the train when it was further from him than Mr.
Peebles was from the cut, and also heard the bell ringing after the
train left Weston, and before it reached the cut.    John E. Bartron
was a half mile north across the field from the crossing.    He says the
atmosphere was clear, and no wind blowing; that he heard the
rumble of the train before it reached Weston Station; that he first
saw it before it reached the cut, and "heard the rumble of the train
long before I saw it"; that it was running as fast as the Blue Line
usually runs, 50 or 60 miles an hour; that his attention was first at-
tracted by the roar of the train, and he heard it from then until the
train stopped, about 1,500 feet beyond the crossing.    After the acci-
dent, he drove over the road, to experiment when the same train was
passing; and, from behind the alleged obstruction, he heard it all the
time from its passage through the cut.    Jacob J. Garretson was
three-quarters of a mile back from the crossing; more than three
times the distance of Mr. Peebles from the cut.    He says the noise
of the train was quite loud from where he was; that it was a still

v.67 f.no.5—38

day. Wilson, another witness, was a little further from the cut than Mr. Peebles, and to the north of the road. He heard the train "rumbling through the cut." John Dougherty was on the east side of the railroad, three-quarters of a mile from the crossing, and fully three times as far as Mr. Peebles from the cut, and says it was a warm, still, dry day; that he heard the whistle blown for Weston Station; that he heard the rumbling of the train from the crossing at Weston, approaching the cut, and as it came out of the cut. The testimony of these witnesses, all of whom were called by the plaintiff, show that they severally heard the train that afternoon, under conditions less favorable than those Mr. Peebles was in. The conclusion is irresistible that if the latter had been listening for the train, as he was bound to do, he would not have lost his life. The two methods of passing this spot seem to be summed up by one Veghte, a witness for plaintiff, who drove along the road to experiment after the accident. When asked about hearing the train when passing along the road where his vision was obstructed by the tool house, he says:

"I have come by there when I couldn't hear the train, when I wasn't listening for a train; but, when I was listening, I could hear, but, when I wasn't, I couldn't. Q. If you stop and listen, you could have heard it then? A. Yes, sir."

If Mr. Peebles heard the approaching train, it was his duty to have stopped. Dougherty testified that, in passing that point at another time, he heard the noise of a train, and could not see it; that he stopped about 30 feet from the track, and, as he stopped, a train came from back of the tool house.

But, supposing the decedent listened and did not hear the train, he had an opportunity to look before attempting to cross the track. The testimony of plaintiff's witnesses shows there was a clear view to the cut at a point 20 feet back from the track. James Z. Bergen says the obstruction began 60 feet back from the track, and continued for 35 or 40 feet. He says (speaking of traveling on the highway):

"That this tool house obstructs the way for thirty-five feet. Then you come within twenty feet—not much less, if any—of the track. Then you can see. You can see all the way down to the bridge [cut]."

The testimony of Merrell, another witness, is:

"Q. Before you drive on the track, you could look down the road a long distance, after you pass the point where you claim this tool house interferes? A. Certainly; you can stop there and look."

He says there was a slight grade from 30 feet back up to the track; and Bartron, another witness, says that, when the horse went up the grade, you could see down the track past the tool house. Garretson, another witness, says the tool house ceases to obstruct 20 feet from the track, and Dougherty says the same thing. These are all plaintiff's witnesses.

It certainly was Mr. Peebles' duty to look up the track as soon as his line of vision was open. If he had done so, he could have stopped. To our mind, it is quite evident he did not look. The same lack of precaution which led him over the other part of the

road without listening must have led him over this without looking. The necessity for an observance of due care on the part of a man approaching a crossing of this kind, at a time when he knew a train of extraordinary speed was due, where his view had been cut off, as plaintiff's witnesses testified, was imperative. Where the animal he was driving was hard in the mouth and hard to back, and where the ditch in the road prevented him from turning in case he should meet the train, the necessity became the more pressing for him to avoid placing himself in such a position of peril. If he attempted to cross the track under these circumstances without taking any precautions for his own safety, he certainly took the risk of his life in his own hands; and from the proofs but one satisfactory conclusion results,— that he did not look nor listen for the train. As we have seen, others, under less favorable conditions, heard it; and the presumption is overpowering that, if he had listened for it (waiving the question whether the whistle was blown in time), he could have heard the rumble and roar of the train, which the plaintiff's witnesses all heard; and, if he could not see it while his vision was obstructed by the tool house, he certainly had the opportunity of looking for it before he reached the track. To our mind, it is clear that the accident would not have happened had the decedent observed the due measure of care which the situation demanded of him. There was contributory negligence, and the defendant was entitled to binding instructions.

While we base the proof of contributory negligence on the plaintiff's testimony alone, we deem it proper to refer to the defendant's in part, as bearing on the question whether the verdict should be sustained.

Henry C. Clark, an engineer of experience, and a brother of the engineer on this train, was riding on the left hand side of the engine this trip. He says the bell was rung by the fireman from before they got to Weston, through the cut, and until the alarm sounded; that the crossing whistle was properly blown at the whistling board; that, immediately after, the alarm whistle was blown, and the air brakes applied; that he then saw the buggy advancing to the crossing, the head and neck of the horse then on it; that the curtains were down, and he could not see who was in the buggy; that the horse made a momentary stop, then a spring forward, and cleared the track, but the buggy was struck.

George W. Clark, the engineer, says:

"A. On coming out of the cut,—that is, below the crossing there,—I sounded the crossing whistle; and while I still had hold of the rope, hadn't let go of it yet. I cast my eyes across to the right, and I seen some kind of a vehicle, a carriage, something of that description, approaching the crossing. I kept my eyes on it for a trifle of time, and seen that they paid no attention to the crossing signal. I then commenced to sound the alarm whistle, and he still paid no attention to it, and I kept sounding the alarm whistle right along, and the carriage kept proceeding until the horse's head got about over the east-bound track. That was the track I was on. And there was what I would term a kind of pause, as if probably the carriage was going to back, or something that way; but they proceeded across the track. Q. Well, did you see any motion of the reins, or anything of that kind? A. It seemed to me that I seen a rein move, as if— Well, I couldn't tell you; up and down with the rein, in that way [illustrating]."

He says he applied the air brakes at once; that the bell was ring-ing all the time from Weston Station until the accident; that he saw the vehicle rounding the turn, and had a view of it until it was struck; that the tool house did not obstruct his view.

Brant, the fireman, says he rang the bell all the time from Weston Station until past the crossing; that he saw the man driving towards the crossing, and, when the horse's head was to the crossing, the horse stopped momentarily; that the man pulled the lines with one hand, and hit the horse with the other, and it jumped across the track; that the whistle was blown for the crossing before the whistle board was reached; immediately thereafter the alarm whistle fol-lowed, and the air brakes were applied; that he saw the buggy roof all the time over the top of the tool house; that the horse came along at a pretty smart walk; that he did not stop during all this time until the pause at the crossing itself; says he did not see the man look out; all he saw was his arms. Wilson, a milk agent, was on the next car to the engine; says he heard the crossing whistle blown, followed by the alarm, and felt the air brakes applied; that he leaped to his feet, and ran to the door. He is positive the alarm whistle was blown just as the whistle board was passed. Stryker, who was working in the fields a half a mile north of the railroad, says he heard the whistle just as the train was coming out of the cut. In addition to this, Taylor and Canfield, passengers, and Cuthbert-son, the conductor, all testified that the crossing whistle and the alarm whistle were sounded and the brakes applied, but at what point they were unable to say.

In opposition to all this, we have the testimony of a number of wit-nesses for the plaintiff who state that they looked at the train when they heard the whistle, and that the train was then near or passing the tool house. But, in considering the testimony of these wit-nesses, the seeming contradiction must be modified by the fact that the sound would be from three to four seconds in reaching a person three-quarters of a mile away, and that during that time, at the 60-mile rate the train was running, it would have covered from 240 to 320 feet, a very substantial part of the distance between the whistle post and the tool house.

After a careful review of the entire testimony, we are of opinion that, tested by the rule laid down above, the court should have given binding instructions in favor of the defendant.

The judgment of the circuit court is reversed, and the case is re-manded to that court, with directions to award a new trial.